This is an appeal from a final order of a Disciplinary Board of the Alabama State Bar Commission denying the petition of Jack Gullage Bonner for reinstatement as an attorney under Rule 19 of the Rules of Disciplinary Enforcement of the Alabama State Bar. Because the facts in this case are particularly egregious, we shall recite only those facts necessary to shed light on this appeal.
Jack Bonner is 48 years of age, married, and has one dependent daughter. He was *Page 735 
licensed to practice law by the State of Alabama in 1965. In 1970, he moved to Gadsden, Alabama, where be began processing loans for Old Southern Life Insurance Company. On September 13, 1977, the petitioner, Jack Bonner, while a licensed attorney, entered a plea of guilty to the charge of violating Code 1975, § 27-27-26. This statute provides:
 Any officer, or director, or any member of any committee or any employee of a domestic insurer who is charged with the duty of investing or handling the insurer's funds . . . shall not borrow the funds of such insurer; shall not be pecuniarily interested in any loan, pledge or deposit, security, investment, sale, purchase, exchange, reinsurance or other similar transaction or property of such insurer except as a stockholder or member. . . .
While employed as an attorney for Old Southern Life Insurance Company, Jack Bonner, indeed, did become pecuniarily interested in many loans made by that company, although he was prosecuted for only one loan. As part of his agreement to plead guilty to violating Code 1975, § 27-27-26, Bonner agreed to surrender his license to practice law in the State of Alabama, and he did surrender said license, effective September 26, 1977. As a result of his plea of guilty, he was sentenced to twelve months in the county jail, but the sentence was suspended.
In 1972, Bonner arranged a loan from Old Southern Life Insurance Company for a Howard McCullough in the amount of $24,000.00. The loan was never consummated, but Old Southern issued its check for $24,000.00 directly to Bonner and he used the money for office expenses and his personal use. The money was received some time in October or November 1972, and had been dissipated by July of the following year.
Bonner admitted that he arranged three fictitious loans to raise the $24,000.00 which he had misappropriated. The borrowers on the loans never received the proceeds of the loans and did not, in fact, own the properties which the records of Old Southern Life Insurance Company indicated were security for the loans. In addition to these fictitious loans, Bonner negotiated at least seven other fictitious loans, making a total of over $50,000.00 in bogus loans from Old Southern. All of these loans were arranged during a period commencing in 1970 and ending in 1973. In connection with many of these loans, Bonner would secure appraisals and insurance on non-existing property — placing false recording data on the mortgage instruments, although the documents had not been recorded at all. He also rendered false title opinions on some of the property and paid "straw people" to execute documents and then cause title to be transferred to himself. Bonner kept fictitious loans from lapsing into default by making periodic payments himself to Old Southern.
He explained that he had been personally involved in approximately 40 to 50 kickback transactions with Old Southern. In his capacity as closing attorney he would carefully explain to the borrowers that ten percent of the loan had to be taken back as a fee. After the ten percent had been taken out, Bonner said, he would keep between three and four percent and give the rest to the president of the company, Roy Epperson, and other officials.
In February or March of 1974, Bonner went on the official payroll of Old Southern Life Insurance Company as its general counsel; he actually moved his family to Montgomery in July 1974, in order to be able to protect himself on the fictitious loans he had engineered. Bonner knew that the state examiners were moving on Old Southern and he knew that it would not be long before they figured out what was going on. The state examiners did figure out what was going on and Bonner went to the president of Old Southern, Roy Epperson, and asked him where he might borrow $50,000.00 to make good the fictitious loans that he had processed. Epperson told Bonner to speak with James Lane (the general manager of Old Southern). Lane did provide Bonner with $50,000.00 and took a mortgage on property ostensibly owned by Bonner. It later became necessary for him *Page 736 
to foreclose on this property. The foreclosure proceeds were applied against the loan, leaving a balance of $35,000.00, which was still due and owing by Bonner at the time of the last hearing before the Disciplinary Board. Bonner has had two hearings before the Disciplinary Board in less than three years from surrender of his license.
At the second disciplinary hearing, Bonner indicated in his petition that since the first hearing, James Lane had loaned him $1,000.00 and had advanced him $5,000.00 on a "finder's fee" to procure American Consumers Company for Old Southern. Bonner testified that he has no "qualms" about association in a legal way with Old Southern — he would represent them as their lawyer under appropriate circumstances if he were reinstated.
Bonner verified that the $50,000.00 check payable to him could have come from the account of an agency owned by Lane called Old Southern Insurance Agency. Although the payments under the $35,000.00 note secured by a mortgage to James Lane are $633.00 a month, Bonner has not made a single payment, nor has James Lane pressured him concerning payments. To the contrary, he has made available to him an additional $6,000.00. Petitioner admits that he is still on good terms with the officials of Old Southern. Since his disbarment, he has actively sought for Old Southern the acquisition of companies that were in distress. While an attorney for Old Southern in 1974, he negotiated its purchase of Georgia Life and Health Insurance Company for a $340,000.00 cash outlay with the balance of the purchase price to be paid out of premiums collected from Georgia Life and Health policies. However, he steadfastly maintains that he has paid off and satisfied his obligation on the fictitious mortgages and he has no concrete information of where the $50,000.00 came from that James Lane made available to him to pay off his debt.
Petitioner's first petition for reinstatement was filed on July 17, 1978. At that hearing, petitioner made it known to the Board that he had borrowed $50,000.00 from James Lane and paid back Old Southern for losses it had sustained as a result of petitioner's mishandling of the company's funds. On January 31, 1979, by unanimous decision, the Board denied Bonner's first reinstatement petition.
On February 11, 1980, he filed a second petition for reinstatement and a hearing was had on this petition on May 30, 1980. The day before the scheduled hearing for May 30, 1980, the Bar's assistant general counsel, by telephone, requested the chairman of the Disciplinary Board to continue the hearing from May 30, 1980 to June 27, 1980. The reason given by the assistant general counsel was that he needed additional time to pursue the issue of whether restitution had really and truly been made to Old Southern Life of Bonner's $50,000.00 indebtedness to it, or whether the funds made available to Bonner in truth, were funds of Old Southern's wholly owned subsidiary, Georgia Life and Health Insurance Company, funneled through its general manager and agent, James Lane. Petitioner refused to agree to the continuance and the chairman of the Disciplinary Board indicated that the injection of this issue in the case, even though not proved, might cloud the hearing and suggested that the petitioner may be advised to agree to a continuance. Petitioner, however, refused to agree to a continuance and the Disciplinary Board denied the request of the assistant general counsel and proceeded with the hearing. After the hearing was completed, and on the same day, the Board again unanimously denied Bonner's petition for reinstatement.
Besides his own testimony before the Board, Bonner introduced the testimony of two live witnesses and introduced 17 affidavits attesting to his present good moral character and fitness to be reinstated as an attorney in the State of Alabama. There was only one objection made to his application. That objection was made by a person who said Bonner owed him about $900.00. After the objection was made, Bonner amended his petition to include this loan.
Having set forth the facts, we now compliment the parties' attorneys for the excellent briefs furnished us seeking to apply the *Page 737 
law to the issues raised by the facts. As we see it, the issues framed by the briefs of the parties are as follows:
I. a. Was the petitioner denied procedural due process of law at his disciplinary hearing when issues were raised for the first time at a hearing itself, of which he had only one day's notice?
b. If the petitioner was not denied procedural due process, did he nevertheless sustain his burden of proof at the reinstatement hearing, entitling him to readmission to the Bar of the State of Alabama?
II. Was the petitioner denied substantive due process of law at a disciplinary hearing where the Disciplinary Board did not follow with exactitude its own rules?
We answer in the negative to each issue and affirm.
 I. (a) and (b)
The petitioner's arguments that he was denied procedural due process when the Bar's assistant general counsel, at virtually the last minute, raised the issue of whether he had actually reimbursed Old Southern for its losses fall short of their mark because of an inherent confusion of the burden of proof in original disbarment cases, as opposed to cases where the attorney seeks readmission to the Bar. In original disbarment cases, the burden of proof is on the Bar's counsel to prove facts sufficient to justify the Disciplinary Board in ordering disbarment. The burden of proof is on the other party in reinstatement cases. In such cases, the disbarred lawyer must prove by clear and convincing proof that he is entitled to reinstatement. The governing principle is in Rule 19 (c) of the Code of Professional Responsibility of the Alabama State Bar (Rules of Disciplinary Enforcement), which reads as follows:
 At the hearing the petitioner shall have the burden of demonstrating by clear and convincing evidence that he has the moral qualifications to practice law in this State and that his resumption of the practice of law within the State will not be detrimental to the integrity and standing of the Bar or the administration of justice, or subversive of the public interest. . . .
Our analysis of the rule leads us to the conclusion that the Bar's counsel was under no obligation to offer any evidence in the reinstatement proceedings. His calling attention to a weakness in petitioner's proof on restitution can by no means be construed as denial of procedural due process, inasmuch as it was the burden of the petitioner to negate any inference that restitution had not been made.
Petitioner suggests that he had been led to believe that the issue of restitution had been laid to rest in the first reinstatement hearing. We have read and reread the record, in an attempt to find any commitment, stipulation, or promise, but have been unable to find any support for this belief.
It was observed in In re Hiss, 368 Mass. 447, 333 N.E.2d 429,438 (1975):
 The judgment of disbarment "continues to be evidence against . . . [the petitioner] with respect to lack of moral character at later times in accordance with the principle that `a state of things once proved to exist may generally be found to continue.' Galdston v. McCarthy, 302 Mass. 36, 37, 18 N.E.2d 331, 332
[1938]. Whatever the offense for which a judgment of disbarment was entered, the person disbarred has a heavy burden on a subsequent petition for admission to the bar to overcome by evidence the weight of the facts adjudicated by such judgment and to establish affirmatively that since his disbarment he has become `a person proper to be held out by the court to the public as trustworthy.'" Matter of Keenan, 313 Mass. 186, 219, 47 N.E.2d 12, 32 (1943). See McArthur v. State Bar of Cal., 28 Cal.2d 779, 788, 172 P.2d 55
(1946). [Footnotes omitted.]
Proof that an attorney has become a proper person to be held out to the court as worthy of public trust includes overwhelming proof that restitution has been made, in fact, as well as in form. Petitioner may have been well advised to have produced James Lane at the hearing and all legal documents surrounding the loan transaction with James Lane, including the *Page 738 
disbursement checks to prove, unequivocally that the restitution was genuine and not a pre-text.
We have set out facts in the beginning of our opinion which are rather bizarre. There are some who take the position that there are certain heinous offenses against the judicial system which should forever bar attorneys from reinstatement. The rule would be that "no matter what a disbarred attorney's subsequent conduct may be; no matter how hard and successfully he has tried to live down his past and atone for his offense; no matter how complete his reformation — the door to restoration is forever sealed against him." In Re Stump, 272 Ky. 593,597-598, 114 S.W.2d 1094, 1097 (1938). We do not subscribe to this position in Alabama. Alabama has subscribed to the principle set forth in the case of In Re Stevens, 59 Cal.App. 251
at 255, 210 P. 442 (1922):
 [O]ne who has been guilty of the acts which he has committed should not be reinstated in the ranks of the legal profession except upon the most clear and convincing, nay, we will say upon overwhelming, proof of reform — proof which we could with confidence lay before the world in justification of a judgment again installing him in the profession which he has so flagrantly disgraced. [Emphasis added.] [Cited in In re Stephenson, 243 Ala. 342, 10 So.2d 1 (1942)].
Under that holding, Bonner was due to offer proof to the Disciplinary Board concerning the restitution matter that would make him "clean as a hound's tooth."
The petitioner has cited for our consideration several important United States Supreme Court cases, as well as our decision in Opinion of the Justices, 345 So.2d 1354 (Ala. 1977). These cases are Willner v. Committee on Character andFitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1964); InRe Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); and In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527
(1967). These cases deal with the notice required to meet procedural due process standards. They are important and probably would be decisive if this were an original disbarment case. The Willner case is a petition by the plaintiff to be allowed to be admitted to the practice of law. The Ruffalo case is a case concerning whether or not an attorney should be disbarred in federal court, where he had been disbarred by the Supreme Court of Ohio. The Gault case involves the commitment of a 15-year-old boy to the state industrial school as a juvenile delinquent. All of these cases are inapposite here. None are bar reinstatement cases. The United States Supreme Court case that comes closest to the factual situation involved in the instant case is Greenholtz v. Inmates of the NebraskaPenal and Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100,60 L.Ed.2d 668 (1979). There, the court held that inmates in a penal institution had a liberty interest under the 14th Amendment to the Constitution of the United States that was protected by due process, but it was a different liberty interest from that of persons who were already on parole and against whom parole revocation was being sought. The majority of the court explained the difference between the rights of persons expecting release from incarceration and the rights of persons who are already free on parole but subject to procedures which might possibly bring about incarceration. The court held that the petitioners in the Greenholtz case (inmates in Nebraska penal institutions) had received all the process that was due them by the procedures set up by the Nebraska State Board of Parole. We hold that the Disciplinary Board, in affording petitioner an opportunity to rebut any confusion that may have been caused by the issue of restitution, afforded all the process that was due and which petitioner's liberty interest justified under the facts of this case.
We agree with the petitioner that an application for reinstatement of an attorney, after judgment of disbarment, must be treated as an application for admission to practice, and not an application to vacate the order of disbarment. In reStephenson, 243 Ala. 342, 10 So.2d 1 (1942); In re Gaines,251 Ala. 329, 37 So.2d 273 (1948); Ex parte Montgomery, 244 Ala. 91, *Page 739 
12 So.2d 314 (1943); Danford v. Superior Court, 49 Cal.App. 303,193 P. 272 (1920). However, we have said that his burden is usually heavier because he must dispel the cloud of distrust engendered by his disbarment. Because application for reinstatement is to be considered an application for admission, petitioner argues that our recent decision in Reese v. Board of Commissioners ofthe Alabama State Bar, 379 So.2d 564 (Ala. 1980), mandates his readmission to the Bar. The cases are clearly distinguishable. In Reese, the petitioner was making his first application for certification as a law student. His brushes with the law were not nearly as severe as Bonner's.
Although we are not privy to the reasons for the Board's decision not to reinstate Bonner, we can see reasonable bases for failure to reinstate, based solely on the testimony of Bonner. Canon 9, Code of Professional Responsibility of the Alabama State Bar, provides that lawyers should avoid even the appearances of professional impropriety. In his sworn testimony, Bonner indicated that he had no qualms about his legal association with Old Southern, under appropriate conditions. This is the same company that he said required him to give kick backs on 40 or 50 occasions. Even since his disbarment, he has performed business responsibilities for Old Southern, to the extent he was loaned $1,000.00 by James Lane and given an advancement of $5,000.00 on an assignment which is yet to be accomplished. It is conceivable that the Disciplinary Board felt that if Bonner were reinstated, he would go right back to the same business that originally got him in trouble.
We agree that although courts are slow to disbar, they are slower to reinstate. In re Petition of Morrison, 45 S.D. 123,126, 186 N.W. 556, 557 (1922). The petitioner here has been disbarred for a little over three years. It is common knowledge that virtues do not come about more quickly than vices. The Disciplinary Board could have had these principles in mind when it refused to reinstate the petitioner.
Under the circumstances, we cannot say that the Board was wrong in deciding that Bonner had failed to prove by clear and convincing evidence that he had reformed, was of good moral character, and was worthy to be enrolled as an attorney in the State of Alabama.
 II.
Petitioner complains that the Board of Bar Commissioners did not comply with Rule 19 (c), which provides as follows: "Upon receipt of the petition by the Disciplinary Board the Chairman shall promptly set the petition for a hearing within 28 days." Here, the petition was set for a hearing 109 days after it was filed. Petitioner quotes a statement cited in Frozen FoodExpress, Inc. v. United States, 535 F.2d 877, 880 (5th Cir. 1976), to the effect that "There may not be a rule for Monday, and another for Tuesday, a rule for general application, but denied outright in a specific case." This is essentially an equal protection argument and petitioner has not demonstrated that other applicants' petitions have been set within the 28 days, and his was arbitrarily set 109 days from filing. For aught that appears, other petitions may have been set more than 109 days from the filing.
Finally, we hold that the 28-day rule is directory and not mandatory. Failure to comply therewith, where reasonable and absent substantial prejudice to the petitioner, may be tolerated. Arden v. State Bar of California, 52 Cal.2d 310,341 P.2d 6 (1959); Geibel v. State Bar of California, 11 Cal.2d 412, 79 P.2d 1073 (1938), cert. denied, 305 U.S. 653,59 S.Ct. 248, 83 L.Ed. 423 (1938); In re Posler, 393 Mich. 38,222 N.W.2d 511 (1974); Matter of Wireman, 367 N.E.2d 1368 (Ind. 1977), cert. denied, 436 U.S. 904, 98 S.Ct. 2234,56 L.Ed.2d 402 (1978), 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261
(1980).
Nothing in this opinion is to be construed as precluding petitioner from reapplying for admission to the Bar, consistent with rules set forth in the Code of Professional Responsibility of the Alabama State Bar, *Page 740 
adopted May 6, 1974. The Board will consider his petition in the light of the principles set forth in this opinion as well as the general law of reinstatement of attorneys. Its decision of May 30, 1980, is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, SHORES, EMBRY and BEATTY, JJ., concur.